UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

YVETTE RIVERA,

                Plaintiff,

      v.

MCI INTERNATIONAL, INC. a/k/a
MCI, INC.,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

05 CIV 10670 (CM)(LMS)

## DEFENDANT'S RULE 56.1 STATEMENT OF UNCONTROVERTED MATERIAL FACTS

Defendant MCI, LLC, doing business as Verizon Business ("MCI"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, respectfully submits this Statement of Uncontroverted Material Facts to accompany its Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof.

### BACKGROUND

1.      Plaintiff Yvette Rivera began working at MCI's Rye Brook, New York facility as the Executive Administrative Assistant to Blair Crump on August 15, 2003.  Rivera Dep. at 27: 3-4, 14:19-20.[1]

2.      At the time of Rivera's employment, Crump was the Senior Vice President of the Global Sales Organization and the highest-ranking executive in MCI's Rye Brook office.

---

[1] All citations to deposition transcripts can be found as attachments to the Declaration of Elise Zealand dated September 27, 2006 ("Zealand Declaration"), filed concurrently herewith.

Norman Dep. at 27:5-6, 26:18-21; Rivera Dep. at 27:8-18.  His position put him in charge of a two billion dollar business with more than fifteen hundred employees under his management. Crump Dep. at 117:10-19.

3.      Rivera also provided administrative assistance to Crump's Chief of Staff Denise Austin, who was a Senior Business Manager within Crump's organization.[2]  *See* Austin Dep. at 27:22-28:4, 15:15-19.

4.      Rivera became pregnant in January 2004 and notified Crump that she was pregnant on or around February 25, 2004.  Rivera Dep. at 182:25-183:4; 78:13-18.

5.      Rivera took maternity leave from August 24, 2004 until November 16, 2004. Rivera Dep. at 248:12-22; Bates No. VB 00286, Ex. A.[3]

6.      Her employment was terminated on December 9, 2004.  Bates No. VB 01014, Ex. B.

7.      Marcia Cornelius, another administrative assistant who provided back-up support for Crump, was pregnant around the same time as Rivera.  *See* Cornelius Dep. at 11:21-23; Declaration of Marcia Cornelius (Cornelius Decl.) ¶ 5.  Cornelius also took pregnancy leave, returned to her position at MCI, and has alleged no discrimination of any kind.  Cornelius Decl. ¶¶ 6-7.

8.      Indeed, Rivera stated in her EEOC Intake Questionnaire that "[a] co-worker was pregnant at the same time and was treated favorably."  Bates No. YR 110, Ex. C.

---

[2] Crump's previous assistant, Carol McQuillar, also provided support for Austin in addition to Crump.  McQuillar Dep. at 6:20-25.

[3] All exhibits herein are attached to the Zealand Declaration.

**RIVERA'S EMPLOYMENT WITH MCI AND HER JOB RESPONSIBILITIES FOR BLAIR CRUMP**

9.      Rivera was first interviewed for the job by Austin, who at the time worked directly for Crump as his chief of staff.  Austin Dep. at 21:23-25, 22:8-10; Rivera Dep. at 18:6-8.

10.     Rivera's starting salary was $55,016.  Bates No. YR 157, Ex. D.  In February of 2004 Rivera received a raise of 1.45%, raising her salary to $55,813.73.  Bates No. VB 00068, Ex. D.

11.     Prior to taking the position, Rivera understood that Crump was a busy executive and the position was not a typical nine-to-five position.  *See* Rivera Dep. at 19:10-12.  Her hours were set at 8:30 a.m. to 5:30 p.m., although she understood that there were times she might have to be flexible in order to accommodate Crump's schedule, and she indicated her willingness to do so.  *See* Crump Dep. at 64:6-10; Rivera Dep. at 18-23.

12.     This flexibility in work schedule was one of the requirements of the position prior to Rivera's hire.  Her predecessor often worked past 5:30 p.m. and when MCI listed the "skill sets" it sought in candidates for the position, it included the ability to "work beyond an 8-5 schedule."  McQuillar Dep. at 6:16-19; Bates No. VB 00303, Ex. F.

13.     Rivera's primary responsibility was to answer Crump's phone lines and ensure coverage in the event she was unable to do so.  Crump Dep. at 17:4-9, 37:5-9.  Rivera also was charged with keeping Crump's calendar, arranging his travel, and performing other administrative tasks as requested.  Rivera Dep. at 23:10-19.

14.     As a senior executive, Crump needed an assistant who could provide seamless coverage of his phones and accurately schedule meetings.  Hilber Dep. at 27:2-6.

15.     Rivera understood that her position as Crump's assistant placed greater demands on her than the administrative assistants who supported executives below Crump's level,

particularly after a reorganization in October of 2004 that resulted in additional responsibilities for Crump, and, concomitantly, Rivera. *See* Rivera Dep. at 251:17-253:1.

16.      Crump had a requirement during working hours that his phones were to be answered by a live person, and not answered by voicemail. Crump Dep. at 21:8-16; *see* Norman Dep. at 25:12-15, 41:13-14, 42:19-21. Crump traveled frequently and often needed to speak to his assistant to retrieve messages or because of a travel delay or schedule change. Rivera Dep. at 29:9-18; *see* Crump Dep. at 48:17-20.

17.      Crump frequently received calls from high-level executives, both from MCI and from various clients and customers who expected their calls to be answered by a live person. Crump Dep. at 21:14-16; Austin Dep. at 38:16-20.

18.      Marcia Cornelius, Laurie Perfetto and Carol McQuillar worked in the Rye Brook office as administrative assistants and provided back-up coverage for Crump's phone lines in the event that Rivera was unable to answer the phones herself. Austin Dep. at 40:2-17; Cornelius Decl. ¶ 8.

19.      If Rivera needed to leave her desk or the office for any reason, it was her responsibility to contact one of the back-up administrative assistants to cover the phone. Austin Dep. at 26:14-19; Rivera Dep. at 45:13-21, 54:19-55:7. Rivera was required to give the back-up assistants any information they would need in the event Crump called, including messages, schedule changes and travel details. Bates No. VB 00323, Ex. G.

20.      Each of the back-up assistants also had primary responsibility for providing administrative assistance to other, lower-level executives. Austin Dep. at 40:2-17, 36:14-25. All of them were subject to Crump's requirement that his phones not be answered by voicemail. *See* Hilber Dep. at 49:22-24; *see* Rivera Dep. 54:19-55:7.

21.     To this day, Crump requires that his phone be answered by a live person. *See* McQuillar Dep. at 12:15-25; *see* Cornelius Decl. ¶ 10. Cornelius, Perfetto and McQuillar continue to provide coverage for Crump's phones and act as back-up support for Crump's current assistant, Maritza Schuck. McQuillar Dep. at 8:6-13; Declaration of Carol McQuillar (McQuillar Decl.) ¶ 5; Cornelius Dep. at 6:18-24; Cornelius Decl. ¶ 10.

22.     When she worked for Crump, McQuillar frequently (more often that not) worked until anywhere from 6 p.m. to 7:30 p.m. to meet the demands of the job. McQuillar Dep. at 6:16-19.

23.     At the time McQuillar worked directly for Crump, her young daughter was preparing to enter high school and had been invited to participate in various educational programs such as "Prep for Prep" to help her gain admission to a private school. McQuillar Decl. ¶ 4. Crump discussed the importance of these kinds of programs with McQuillar and urged her to take time off from work to attend them with her daughter. *Id.* When it came time for McQuillar's daughter to choose a boarding school to attend, Crump spent time going over the schools with McQuillar and providing her with information to help her make a decision. *Id.* McQuillar credits Crump's encouragement as a "big factor" in her daughter ultimately enrolling in Miss Porter's School in Connecticut. *Id.*

24.     Crump's current assistant, Maritza Schuck, has two young children. McQuillar Decl. ¶ 5.

## RIVERA'S PERFORMANCE DIFFICULTIES AND COMPLAINTS

25.     Within a few months of Rivera being hired, Austin and Crump became concerned about her performance, specifically with regard to phone coverage and scheduling. Crump Dep. at 34:6-36:25; Declaration of Denise Austin (Austin Decl.) ¶¶ 6-7; Norman Dep. at 124:6-15.

26.     On occasion, Rivera left her desk for extended periods of time without notifying Austin or any of the administrative assistants who provided back-up coverage for Crump's phone lines. Rivera Dep. at 227:7-228:11; Cornelius Dep. at 9:9-10:8; Norman Dep. at 46:3-7, 124:6-15; Hilber Dep. at 25:10-17; Bates No. VB 00224, Ex. H.

27.     This resulted in cases in which Crump would call his own phone line to speak to Rivera and his call would go into voicemail. *See* Crump Dep. at 36:10-25.

28.     Various callers complained to Crump that their calls were answered by voicemail. *Id.*

29.     Rivera's failure to notify the other assistants when she left her desk put them in the difficult position of being responsible for answering the phone, but not receiving any prior notice. *See* Cornelius Dep. at 9:17-10:8. In other instances, Rivera failed to give the back-up assistant the information Crump would need if he called, such as messages or travel information. Austin Decl. ¶¶ 6, 7; *see also* Crump Dep. at 36:15-25.

30.     One such instance took place in May, when Crump experienced a travel delay. Bates No. VB 00323, Ex. G. He tried to call Rivera for help with alternative travel plans, but she was not at her desk and had failed to provide the back-up assistant with Crump's travel information. *See* Rivera Dep. at 67:18-23; Austin Decl. ¶ 7.

31.     Crump later told Rivera that if he was about to get on or off a plane (or similarly to go into or come out of a meeting), she should wait before leaving for lunch. *See* Crump Dep. at 48:10-20.

32.     Around this time, Crump informed Paul Hilber, then MCI's Director of Human Resources for the Northeast, of his concerns regarding Rivera's job performance. Norman Dep. at 15:16-17; Hilber Dep. at 35:4-18.

6

33.     In response to Crump's concerns, Hilber recommended that Austin supervise Rivera. Hilber Dep. at 35:4-18; Austin Decl. ¶ 5.  During his deposition, Hilber stated the reasons for his decision as follows:

> **Q:** To your knowledge, if you know, what was the reason for that change?
> **A:** It was based on my recommendation.  And my recommendation was based on providing Yvette the most opportunity for daily interaction with someone from Blair's staff so she could be successful in her rol[e].  Blair was on the road constantly.  I think it was difficult for him to be able to provide daily interaction with Yvette in giving her counsel.  And Denise had been Blair's business operations person, staff person for a number of years.  And we thought that would make the best opportunity for Yvette.
> **Q:** When you say "best opportunity," what do you mean for communication? Or I mean –
> **A:** No, to be really a solid contribution to the organization.  Denise's organization. Because it's business operations and it supports – it was supporting Blair's overall segment.  It would really provide an individual with a lot more insight into Blair's overall organization.  And she could give advice and counsel and direction on a daily basis to Yvette to make her job easier, and therefore making her more successful.  Basically connecting all the dots.  And one other piece, you know, we also always look at development.
> **Q:** Development?
> **A:** Further opportunities for people.  We've had administrative people move into staff roles, supporting business operations because they become astute into the systems and reporting and all that.  So it's also like a career ladder.  So where someone could move up the ladder versus being pigeonholed into being an executive assistant.
>
>                                                          Hilber Dep. at 35:8-36:14.

34.     Although Rivera was now required to inform Austin when she would be out of the office and keep her more involved on a daily basis, there was no material change in the terms of her employment.  Austin Decl. ¶ 9; *see* Austin Dep. at 23:25-24:5; Rivera Dep. at 169:17-21; Complaint ¶ 34, Ex. I (noting that after Rivera began reporting to Austin, she was informed "she would continue to support Crump in an Executive Administrative Assistant capacity and retain her prior duties.").  Her position, salary and responsibilities remained the same.  Austin Decl. ¶ 9; *see* Austin Dep. at 23:25-24:5; Rivera Dep. at 169:17-21; Complaint ¶ 34, Ex. I (noting that after Rivera began reporting to Austin, she was informed "she would continue to support Crump in an Executive Administrative Assistant capacity and retain her prior duties.").  *Id.*

35.     In an email dated May 19, 2004, Austin discussed her supervision of Rivera. Bates No. VB 00322-24, Ex. G.  Austin wrote to Rivera, "please I am your best resource on organization changes and other information.  What I can share I will, what I can't I'll let you [k]now, what I don't know, I'll let you know I don't know.  Please though it is also your responsibility to ask me what is going on and if you hear of some change ask about it."  *Id.*

36.     On May 12, 2004, Austin and Rivera met to discuss Rivera's performance.  *See* Bates No. VB 00323, Ex. G; *see* Rivera Dep. at 79:9-15.  Rivera states, "Austin had relayed to me that Mr. Crump was displeased that he couldn't get in touch with me...[a]nd that he would call and that he didn't know my whereabouts and that he couldn't reach me, etc.  I never heard that directly from him."  Rivera Dep. at 195:16-22.

37.     On May 16, 2004, Austin sent Crump and Hilber an email summarizing her conversation with Rivera.  Bates No. VB 00374, Ex. J.  Austin's impression of the meeting was that it had been a "productive, positive discussion" and that in the future Rivera would keep her more involved in her day-to-day activities and view her as a resource.  *See id.*

38.     Austin requested that Rivera and the other administrative assistants copy her on any correspondence relating to scheduling, back-up coverage, and any other issues that might affect coverage of Crump's phones.  *See* Rivera Dep. at 65:14-23; Bates No. VB 00966, Ex. K. Austin also asked for increased communication among all of the assistants.  *See* Rivera Dep. at 65:3-8; *see* Bates No. VB 00322-24, Ex. G.

39.     After the day in May 2004 when Crump experienced a travel delay and could not reach Rivera, and then asked Rivera to wait until after he had boarded his flight before leaving for lunch, Rivera understood Crump to say that she could not take a lunch break at all on days that he was traveling.  *See* Rivera Dep. at 68:6-12, 69:1-4.

40.     On May 18, 2004, Rivera met with Phyllis Norman, then an MCI Human Resources Generalist in the Rye Brook office  to discuss her concern regarding her lunch break. Norman Dep. at 20:24-21:9; Rivera Dep. at 89:4-7, 21-25, 104:15-18.

41.     Norman assured Rivera that she was entitled to take lunch.  Rivera Dep. at 89:4-7, 21-25, 104:15-18.

42.     Rivera also told Norman that she was concerned that Crump wanted her to notify Austin when she would be out of the office.  Norman Dep. at 129:16-23; Bates No. VB 00255-257, Ex. L.  Norman informed Rivera that if Crump wanted her to involve Austin to ensure coverage, then it was Rivera's responsibility to do so.  *See* Norman Dep. at 141:12-16; *see* Bates No. VB 00255-57, Ex. L.

43.     In addition, Rivera said that Crump told her that she seemed "distracted" and that he had concerns about her performance, but he could not cite specifics.  Norman Dep. at 128:7-21; Bates No. VB 00255-57, Ex. L.

44.     Rivera told Norman that she believed that Crump equated her "distraction" with her pregnancy.  Norman Dep. at 128:7-21; Bates No. VB 00255-57, Ex. L.

45.     Rivera testified under oath that this was only her "belief," not something Crump had said.  *See* Rivera Dep. at 103:9-20; *see also* Norman Dep. at 128:7-21.

46.     Finally, Rivera told Norman that she felt as though she was being set up to fail by the other administrative assistants and that she did not want to be perceived as an underperformer.  Norman Dep. at 48:16-21; Bates No. VB 00255-57, Ex. L.

47.     Norman documented her conversation with Rivera and asked her to keep her updated with regard to any further issues she might have.  Norman Dep. at 28:17-22; Bates No. VB 00255-257, Ex. L.

48.     Norman also informed Rivera of MCI's open-door policy which allowed employees to make complaints anonymously in the event that she felt more comfortable doing that at any point in the future. Norman Dep. at 138:8-10, 112:14-17.

49.     Although Norman and Rivera met numerous times over the next few months in order to discuss Rivera's pending maternity leave, Rivera did not raise any additional concerns regarding Crump or Austin. *See* Norman Dep. at 31:8-14.

50.     Norman did not tell Crump or Hilber about her May 2004 conversation relating to Crump. Norman Dep. at 164:2-6; Hilber Dep. at 34:6-16. Indeed, they did not find out about it until after her termination. Crump Dep. at 46:23-47:11; Hilber Dep. at 34:6-16.

51.     Rivera bases her allegations that Crump knew of her "complaint" to Norman on "just a feeling that [she] had" coupled with her belief that Crump, Austin, Norman and Hilber were "very close professionally," and because "the matter didn't improve, the situation stayed the same and eventually got worse." Rivera Dep. at 347:8-20, 353:6-11.

52.     Rivera also met with Austin regarding the issue of Crump's flight delays. Rivera Dep. at 83:20-84:3. Austin told Rivera that she should make it part of her process to check Crump's flight status and communicate with him that flights were on schedule, and if not, to coordinate alternatives. Bates No. VB 00323, Ex. G. If Rivera was not available to do this or part of this (because she was away from her desk for any reason, including lunch), the person covering her would need to have the information so they were able to coordinate. *Id.* Rivera found this to be a satisfactory resolution. Rivera Dep. at 88:21-89:20.

53.     Prior to going on vacation in June, Rivera sent an email to back-up assistants Cornelius and Perfetto informing them of the new requirements that applied to anyone covering Crump's phones as the result of an increase in flight delays: "Blair's travel has picked up lately

and as you know, he's had many issues with delayed and missed flights.  Therefore, he has asked that whenever possible, the person covering his phone remain in the office until his plane has taken off.…[i]f you need to leave the office (for lunch or something) please provide your back up with all his travel details in the event that something transpires during your absence."  Bates No. VB 00966, Ex. K; Rivera Dep. at 65:19-23.

## RIVERA'S PREGNANCY, MATERNITY LEAVE AND RETURN TO WORK

54.     Rivera frequently scheduled her pre-natal doctor's appointments during the work day, occasionally during lunch, but also at other times.  Rivera Dep. at 191:1-6, 193:16-18, *see e.g.,* Bates No. VB 00224, Ex. H; VB 00581, Ex. M.  Despite this, Rivera never missed a single appointment due to work, even when she failed to give her supervisors advance notice of an appointment.  Rivera Dep. at 193:19-24; Bates No. VB 00581, Ex. M; YR 017, Ex. N.

55.     Although Rivera had regular and frequent doctor's appointments and now alleges that she suffered psychological harm, sleeplessness, upset stomach, stress, anxiety, lowered self-esteem, and paranoia, from alleged "discrimination," she testified that she never sought the help of a doctor, therapist, counselor, or anyone else.  Rivera Dep. at 315:12-23, 320:3-321:3.

56.     Rivera testified in her deposition that "Crump would swear and slam doors and hang up on me.  He would never listen to my explanations when he would accuse me of making mistakes with his calendar or his travel or what have you.  He would never admit that he had made a mistake.  He would never apologize.  And he would just go about his business unconcerned about the effect that he was having."  Rivera Dep. at 219:15-23.  When pressed, Rivera admitted that Crump swore at her only a "handful of times."  Rivera Dep. at 220:5-7.  She also testified that he slammed the door to his office approximately twice per week and hung up on her in a "rude fashion" "whenever the mood struck."  Rivera Dep. at 220:5-223:22.

57.     Rivera testified that Crump also behaved in this fashion with her predecessor.
Rivera Dep. at 97:12-16.

58.     At Rivera's deposition, she cited two instances in which she claims Austin
criticized her. *See* Rivera Dep. at 224:14-228:11.  On one of these occasions, Austin sent Rivera
an email asking her to let Austin know when she would be out of the office. *Id.*  Rivera
responded that Austin could have tried to reach her through instant messaging because Rivera
was online all day, but Rivera admitted during her deposition that she was not online all day
because she had a doctor's appointment in the middle of the afternoon.  Rivera Dep. 227:16-
228:3.  On the only other occasion Rivera could recall under oath that Austin purportedly
"criticized" her, she claimed that Austin criticized her work updating an organizational chart.
Rivera Dep. at 224:18-25.

59.     On August 24, 2004, Rivera began her maternity leave.  Rivera Dep. at 248:12-
22; Bates No. VB 00286, Ex. A.

60.     Prior to Rivera's maternity leave, Austin and Norman calculated the number of
sick days and vacation days that would accrue to Rivera, including time that would not accrue
until after her leave, thereby maximizing Rivera's paid time off. *See* Rivera Dep. at 249:1-23;
Austin Decl. ¶ 11; Bates No. VB 00290 Ex. O, VB 00461-62, Ex. P, VB 00510, Ex. Q, VB
01068-01076; VB 01068-01076, Ex. R.

61.     Crump requested that rather than hire someone to fill in for Rivera on a contract
basis while she was out on leave, they find another solution.  Bates No. VB 00844, Ex. S; VB
00825, Ex. T  During Rivera's leave, various employees within Crump's department assumed
Rivera's duties.  Bates No. VB 00332-333, Ex. U; VB 00330, Ex. V.

62.     Rivera gave birth to her son on August 25, 2004.  Rivera Dep. at 249:24-250:1.

63.     In June of 2004, Rivera and her family had moved from Yonkers, New York, about seventeen miles from Rye Brook, to Wantagh, New York, about forty-five miles from the office.  Rivera Dep. at 177:9-10.  This increased her commuting time from twenty minutes in the morning and forty minutes in the evening to an hour in the morning and, depending on traffic, an hour and fifteen minutes to an hour and forty-five minutes in the evening.  *See* Rivera Dep. at 174:1-15, 177:24-178:6.

64.     On November 7, 2004, just prior to her return from maternity leave, Rivera asked Crump if she could leave work early every day – at 5 p.m. rather than 5:30 p.m. – so that she could pick up her children from daycare.  Bates No. VB 00600, Ex. W.

65.     Rivera testified that, after her move, she believed that leaving work at 5 p.m. would decrease her commute by at least half an hour.  Rivera Dep. at 178:12-23.

66.     Rivera also requested a company Blackberry to provide telephone and administrative coverage via remote access during her drive home.  Bates No. VB 00600, Ex. W.

67.     Crump could not accommodate Rivera's early departure request because the demands of his own job meant that he needed phone coverage until at least 5:30 p.m.  Crump Dep. at 64:24-65:8; Bates No. VB 00600, Ex. W.

68.     Crump had always required coverage during that time of the day.  Indeed, his prior assistant, Carol McQuillar, often worked until 6:30 or 7:00 p.m. to accommodate the demands of the job.  McQuillar Dep. at 6:16-19.

69.     Austin sent Rivera an email on November 17 recapping the requirements of Rivera's position and informing her that they would not be able to accommodate a 5:00 p.m. departure time.  Bates No. VB 00445, Ex. X.  Rivera responded: "Thanks for the recap and a clearer picture of what lies ahead." *Id.*

70.     This was the second time Rivera had requested to leave early.  In April of 2004, Rivera requested a 5:00 p.m. departure time in order to attend evening college courses, and was told by Crump that was not a viable option, as he needed coverage "until at least 5:30 p.m., preferably 6:00 p.m."  Rivera Dep. 293:1-296:18; Bates No. VB 00338, Ex. Y.

71.     Crump did not issue Rivera a Blackberry because he only issued Blackberries to director-level employees and above who traveled as part of their job and needed access to e-mail while traveling.  Crump Dep. at 58:1-21.  It was within Crump's discretion to decide whether he would issue a Blackberry or other communication devices to employees within his organization.  *See* Crump Dep. at 58:22-59:8; *see* Bates No. VB 00574, Ex. Z.

72.     Furthermore, Crump feared that if he began to issue Blackberries upon individual request, it would be cost prohibitive given that he had more than 1,500  people in his organization.  *See* Crump Dep. at 59:18-25.

73.     None of the other administrative assistants supporting Crump had a Blackberry.  Indeed, none of the other assistants in the Rye Brook facility had a Blackberry.  *See* Crump Dep. at 58:1-21; Austin Decl. ¶ 10.

74.     Rivera claims that an administrative assistant in the Atlanta office, Jane Biggerstaff, had a Blackberry.  *See* Rivera Dep. at 203:10-20.  Ms. Biggerstaff reported to Steve Young, the Senior Vice President of Commercial Accounts West, who was not part of Crump's organization.  *Id.; see also* Crump Dep. 58:25-59:4.

75.     Crump informed Rivera that despite the fact that Ms. Biggerstaff had a Blackberry, she nevertheless did not meet the requirements for one within his organization.  *See* Rivera Dep. at 207:11-12.

76.     After Rivera returned from maternity leave, Austin discovered that Rivera was locking the door to Crump's office while she "pumped" or "expressed" breast milk in her office for use later.  *See* Austin Dep. at 60:17-61:17; Rivera Dep. at 116:18-23; Austin Decl. ¶ 12.  This concerned Austin because Rivera's office was an anteroom to Crump's office so Crump had to actually walk through her office to reach the outer hallway.  Austin Dep. at 61:4-17; Austin Decl. ¶ 12; Rivera Dep. at 21:13-22, 114:13-17.  .

77.     Austin approached Rivera to discuss making other arrangements.  *See* Austin Dep. at 68:10-13.

78.     Austin initially asked Rivera if it was necessary to pump milk at work.  Rivera Dep. at 113:1-5.  She asked because she was not familiar with the practice of pumping breast milk.  Austin Dep. at 75:7-15; Austin Decl. ¶ 12.

79.     Other MCI employees had used the women's rest room to pump breast milk, so Austin initially proposed that Rivera use the women's rest room too.  Austin Decl. ¶ 12; Rivera Dep. at 117:11-14; Austin Dep. at 68:15-24.

80.     Rivera stated that the rest room was an unsanitary option, so Norman immediately found a private conference room for Rivera to use instead.  Rivera Dep. at 113:1-9, 120:14-16; Norman Dep. at 94:5-10; Austin Dep. at 68:15-24; Austin Decl. ¶ 13.

81.     Rivera was satisfied with this accommodation.  Rivera Dep. at 120:18-22.

82.     During Rivera's maternity leave, Cornelius, Perfetto and McQuillar provided phone coverage for Crump.  Norman Dep. at 145:8-146:6.  The administrative assistants worked well together and notified each other when they left their desks so that they could ensure constant coverage of Crump's phones.  *See id.*

83.     Rivera returned from maternity leave on November 16, 2004.  Rivera Dep. at 248:20-22.

## RIVERA'S DIFFICULTIES WITH CO-WORKERS AND HER TERMINATION

84.     Virtually immediately, Rivera (and the three back-up assistants) began to have numerous difficulties with Rivera's performance of the requirements of the job position.  Bates No. VB 00891, Ex. AA; *see* Austin Dep. at 92:10-21.

85.     Both Cornelius and Perfetto complained to Norman and Austin that they no longer wanted to provide back-up support for Rivera.  Austin Decl. ¶ 14; Bates No. VB 00891, Ex. AA; Norman Dep. at 45:10-23, 49:9-50:1.

86.     On November 18, 2004, Rivera approached Norman regarding back-up coverage and requested that something formal be put in place outlining everyone's phone coverage responsibilities.  Rivera Dep. at 267:6-19; Bates No. VB 00403, Ex. BB; Austin Decl. ¶ 15.

87.     On November 19, 2004, Cornelius came into Norman's office expressing concerns about back-up coverage.  Norman Dep. at 45:10-17; Bates No. VB 00405, Ex. CC. Cornelius told Norman that Rivera was "unprofessional" and did not inform Cornelius when she was going to be away from her desk, making it difficult for Cornelius to provide adequate coverage of Crump's phones.  *Id.*; Austin Decl. ¶ 14.

88.     When Perfetto learned that Cornelius was refusing to back Rivera up, she approached Norman and informed her that she did not want to provide back-up support either. Norman Dep. at 49:9-50:1; Austin Decl. ¶ 14.

89.     Immediately after Cornelius left Norman's office, Rivera entered and told Norman that she believed that the other administrative assistants were "setting her up to fail," because they were refusing to provide back-up phone coverage.  Norman Dep. at 48:16-21; Bates

No. VB 00405, Ex. CC.  Rivera repeated her demand that formal procedures put in place for

back-up coverage.  Norman Dep. at 48:19-20; Bates No. VB 00405, Ex. CC.

90.     Norman told Rivera that she would draft Rules of Engagement (a term commonly

used in the sales organization at MCI) with regard to back-up coverage that would outline each

administrative assistant's responsibilities with regard to answering Crump's phones.  Norman

Dep. at 50:11-23.  Rivera agreed.  *See* Norman Dep. at 50:15-16; Rivera Dep. at 270:4-7.

91.     On November 19, 2004, Norman sent an email to Austin and the four

administrative assistants who provided phone coverage for Crump (Rivera, Cornelius, Perfetto

and McQuillar) informing them that their attendance was required at a meeting on November 23,

2004 to discuss the Rules of Engagement for Crump's phone coverage.  Bates No. VB 00305,

Ex. DD; VB 00997, Ex. EE.

92.     The meeting took place in Rivera's office so that Crump's phones could be

covered during the meeting, since all of the assistants who covered his line needed to be present.

Austin Dep. at 115:13-22, Bates No. VB 00305, Ex. DD.

93.     Austin and Norman discussed the importance of providing adequate coverage for

Crump's phones lines.  *See* Austin Dep. at 116:18-25.  They emphasized that such coverage was

even more critical since Crump took over a new group within MCI in October of 2004, which

extended his responsibilities nationally and globally.  Austin Dep. at 117:2-23.

94.     The meeting resulted in the creation of a document entitled "Administrative

Coverage – Rules of Engagement" dated November 29, 2004 which was addressed to all of the

administrative assistants who supported Crump.  Bates No. VB 00049-50, Ex. FF.  Norman

created the document (which was based on input from all of the administrative assistants) and

Hilber approved it.  *See* Hilber Dep. at 45:7-12.  The document then was circulated to each of the

assistants providing coverage for Crump. Norman Dep. at 56:12-24; Bates No. VB 00371, Ex. GG.

95.    The Rules of Engagement set forth the protocol for providing phone coverage for Crump, including during lunch time and vacations. Norman Dep. at 59:20-60:10; Rivera Dep. at 272:8-23; Bates No. VB 00049-50, Ex. FF. The Rules of Engagement specified that confirmation of coverage should be received before the administrative assistant requesting support leaves her desk. *Id.*

96.    The Rules of Engagement further provided that lunch should be scheduled between 12 and 2 p.m. *Id.* If Rivera was unable to find back-up coverage, she could still take lunch between 12 p.m. and 2 p.m., but situations in which there was no one available to cover for Rivera were rare. *See* Norman Dep. at 60:6-10, 54:4-18.

97.    The Rules of Engagement explicitly provided: "Failure to adhere to the rules of engagement may result in corrective action up to an[d] including termination of employment." Bates No. VB 00049-50, Ex. FF. That was made clear to everyone during the meeting. *See* Rivera Dep. at 273:4-10; Austin Decl. ¶ 15.

98.    At no time during her employment did Rivera ever complain to anyone that she thought the phone coverage protocol was unreasonable. Rivera Dep. at 276:1-20.

99.    MCI employees were given remote access to MCI's computer systems so that they could have access to documents and email outside business hours, when traveling for work, or when the weather was so inclement that travel to the office would not be safe. Crump Dep. at 32:15-33:25; 114:2-6. This remote access was not for purposes of providing phone coverage. *See* Crump Dep. at 33:3-6.

100.   On December 8, 2004, Rivera worked from home without notifying Crump or Austin that she would not be coming into the office. Rivera Dep. at 281:8-283:22. Rivera called McQuillar on her cell phone and asked her to forward Crump's phones to her home. *See* Rivera Dep. at 285:5-11; Norman Dep. at 68:5-10; Bates No. VB 00611, Ex. HH. Rivera then sent Perfetto an instant message letting her know McQuillar would be forwarding the phones to her and asking her to cover until the phones were forwarded. *See* Rivera Dep. at 286:3-8; Bates No. VB 00046, Ex. II.

101.   Both McQuillar and Perfetto offered to provide coverage for Rivera, but Rivera refused. Bates No. VB 00611, Ex. HH; VB 00046, Ex. II; Norman Dep. at 68:7-10.

102.   When Crump called his own telephone line to reach Rivera to retrieve his messages, Rivera's two-year-old daughter answered the phone. Rivera Dep. at 287:7-288:7; Crump Dep. at 43:7-21; Norman Dep. at 68:11-15.

103.   Crump then called Human Resources to ask their advice about how to handle the situation. Crump Dep. at 45:7-46:5.

104.   Hilber determined that Rivera's violation of the Rules of Engagement, and the fact that she worked from home without prior notification or approval, merited her termination and Rivera was terminated the following day. Crump Dep. at 107:23-108:23; Rivera Dep. at 326:10-15; Bates No. VB 00164, Ex. JJ; VB 00019, Ex. KK; Austin Decl. ¶ 17.

105.   Austin was on vacation in New Zealand at the time and did not find out about the termination until after the fact. *See* Austin Dep. at 181:23-24; Austin Decl. ¶ 17.

106.   On December 9, 2004, Norman entered Rivera's office to inform her that her employment was terminated. Rivera told her that she "expected that there would be repercussions for what had transpired the prior day." Rivera Dep. at 328:12-16, 326:8-327:14.

107.    Rivera testified as follows about the reason for her termination:

**Q.** And do you believe you were terminated because Mr. Crump was insensitive to the fact that your child picked up your telephone?
**A.** Yes.
**Q.** And you believe that that's the whole reason why you were terminated?
**A.** Yes.

Rivera Dep. at 292:13-20.

108.    At no time prior to December 8, 2004 did anyone at MCI ever contemplate or discuss terminating Rivera's employment.  Austin Decl. ¶ 18.  Norman Dep. at 158:11-17; Hilber Dep. at 45:3-5, 57:10-15.

109.    Currently, Ms. Rivera works as an executive assistant to a "top executive" at Morgan Stanley in Purchase, New York.  Rivera Dep. at 10:6-9, 11:5-12.  She began her employment there on April 11, 2005.  *See* Rivera Dep. at 10:12-14.

**RIVERA'S PURPORTED DAMAGES**

110.     Rivera filed this lawsuit on December 21, 2005 alleging federal and state claims for sex/pregnancy discrimination, retaliation and hostile work environment.  *See* Complaint ¶¶ 1 *et seq.*, Ex. I.

111.     Rivera seeks the following relief: (1) $18,176.92 in actual damages for lost wages, (2) $75,000 for mental anguish and emotional distress, and (3) $250,000 in punitive damages.  Plaintiff's Rule 26(a) Initial Disclosures, Ex. LL.

112.     Beginning on December 13, 2004, Rivera received unemployment insurance in the amount of $405 per week.  Bates No. YR 169-173, Ex. MM.

113.     From April 8, 2005 through December 31, 2005, Rivera earned $40,560.94 at Morgan Stanley.  Bates No. YR 280, Exhibit NN.  As of March 15, 2006, she had earned $12,291.65.  Bates No. YR 281-82, Exhibit OO.  Thus, in less than one year, Rivera earned $52,852.59 at her new job, while her annual salary at MCI was $55,813.73 at the time of her termination.  Bates No. VB 00068, Ex. E.

Dated:  New York, New York
            September 27, 2006

Respectfully submitted,

By: _____
Eugene Scalia
Elise Zealand (EZ 1443)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Verizon Business,*
*formerly doing business as MCI, INC.*